RACHEL G. TOURTILLOTTE & others *vs.* FRED E. TOURTILLOTTE & another.

Essex.    November 4, 1909. — May 18, 1910.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Trust,* Constructive. *Frauds,* Statute of. *Burial Lot. Equity Pleading and Practice,* Answer.

In a suit in equity against one brother in a family by all of his nine brothers and sisters, in which the plaintiffs sought to have the defendant declared trustee for himself and them of a burial lot, which he had purchased and the title to which he had taken in his own name, the following facts appeared : In 1891 the plaintiffs and the defendant and their father were living together and jointly contributing to the family support. In that year a sister died, and, the family then being without a burial lot and the defendant not at that time having contributed his full share to the family expenses, it was agreed among them that the defend-

ant should pay for a lot which they all selected and that the deed should be made to the father. The defendant paid for the lot, but the deed conveyed the lot to him individually. The making of the deed to the defendant was accidental, and the defendant acted in good faith in the matter. The deed was kept unconcealed in a desk used by and equally accessible to all members of the family. The father never learned of the state of the title, and died in 1895. The plaintiffs learned of it in 1896 or 1897 and then questioned the defendant, who told them that it was all right, that it did not matter, and used other similar expressions which they regarded as amounting to an oral promise to hold the lot for their benefit as well as for his own. In the meantime the body of the mother had been moved from a former home of the family and interred in the lot and another sister had died and had been buried there, as well as the father; and from an annuity provided by insurance of the sister a family monument had been erected upon the lot. In 1906, dissensions having arisen between the defendant and the plaintiffs, he asserted an absolute right in the lot, and the plaintiffs at once brought this suit. *Held,* that, there being an entire absence of a written memorandum of a trust, such as is required by R. L. c. 74, § 1, cl. 4, and by R. L. c. 147, § 1, the suit could not be maintained.

Where a bill in equity, in which the plaintiffs seek to have the defendant, their brother, declared trustee for himself and them of a burial lot, which was purchased by the defendant and the title to which he took in his own name, avers merely that before the purchase the plaintiffs and the defendant orally agreed that the title should be taken in the name of their father, who had died after the conveyance to the defendant, and does not aver any other promise or contract of the defendant with regard to the matter, and relies only upon oral declarations with regard thereto made by the defendant after the purchase, it *is* not necessary for the defendant, in order to rely on the provisions of R. L. c. 74, § 1, cl. 4, and of R. L. c. 147, § 1, requiring a memorandum in writing to make such a promise or declaration enforceable, to allege such defense in his answer.

BILL IN EQUITY, filed in the Superior Court on February 14, 1908, and afterwards amended, against Fred E. Tourtillotte and the Hilldale Cemetery Association, a corporation, by all of the brothers and sisters of the defendant Tourtillotte, nine in number, seeking to have the defendant Tourtillotte declared to be trustee for himself and the plaintiffs of a burial lot which he had purchased from the defendant corporation and the title to which he had received in his own name.

The case was heard by *Pierce,* J. He filed the following memorandum:

" I find that the Tourtillotte family, consisting of father, ten daughters and two sons, of whom the plaintiffs and the defendant formed a part, came to Haverhill from Woodstock, New Hampshire, in or about 1885; that previous to that date the mother had · died and had been buried in her family burial lot in the cemetery in said Woodstock; that at some time previous to May

30, 1891, one of the daughters, Gladys, sickened, and on that day died; that at the time of her death the family had no burial lot other than that in said Woodstock; that while said Gladys was sick there were frequent talks in the family circle about the procurement of such a lot; that at that time all the family were living together, and were each contributing to the family needs from their respective earnings such proportionate sums as they were able; that two of the daughters, Effie L. and Helen A., and the defendant visited one or more cemeteries and finally selected the lot concerning which this suit is brought, which lot was sufficient in size to permit of the burial therein of every then member of the family; that it was then orally agreed that the title to the lot should be taken in the name of the father; that the defendant then stated that, inasmuch as he had not paid his full share of the family expense, he would pay for the lot; and, following said selection, the defendant bargained for the lot and finally paid of his own individual money the sum of $60 therefor, though he did not secure a deed until the September following; that in making such payment he did not loan, or offer to loan, the money so paid out by him to his sisters or to his father; that the deed as finally delivered to him ran to him in his own right and in no way, directly or indirectly, made any reference to the family or any family interests; that in so taking the deed and title he acted in good faith and was free from any purpose to cheat or defraud any one or all the members of his family; that the making of the deed in his name by the grantor was probably accidental, and I so find, and when the error was discovered by the defendant was thought by him to answer the purpose had in view, namely, the purchase of a family lot, as well as if the title had in fact run to the father — and I also find that the family at that time would have been equally satisfied; that the deed was placed in a desk used by and equally accessible to all members of the family, though there was no satisfactory evidence that any member of the family other than the defendant ever saw or read the deed or knew how the title ran until after the death of the father in 1895; that the son lived with and in harmony with all the members of the family until his marriage in 1897; that of the sisters Effie L. died January 21, 1892, and was buried in the lot; that the father, Josiah, died March 3,

1895, and was buried in this lot, and that the mother's body was removed from Woodstock cemetery and buried in the lot; that the said Effie L. left a life insurance annuity of $2,000, which was payable to one of the daughters, Rachel; that previous to her death she had requested that from said insurance money Rachel should cause a family monument to be set up upon said lot; that after her death and the receipt of the insurance money, from such money Rachel caused a monument to be set up at an expense of $675; and also then, and at other times, expended several small sums of money in grading and care of the lot; that the family as a family from time to time expended small sums of money upon the lot, for flowers, etc.; that such sums and such care would have been expended and given, if permitted, irrespective of any question of supposed title or ownership, because of family affection and filial and sisterly duty; that within a year or two following the death of the father in 1895, every one of the family had actual knowledge, arising from an inspection and from an actual possession of the deed, that the title to the lot was in the defendant; that they questioned him concerning it, and that he then said that it was all right as it was, that it did not matter, and other equivalent expressions; that, other than as may be inferred from such kind of talk, no representation and absolutely no misrepresentations were made by the defendant to his sisters, which could or did lull them into a sense of security or lead them to rest inactive; and that matters remained *in statu quo* until 1906, when the defendant, dissension having sprung up in the family concerning other matters, in terms notified the sisters that he claimed an absolute and unconditional right in the lot and denied their right.    This suit followed.

" Upon the foregoing facts I find that neither a resulting nor constructive trust was established, and the order is that the bill be dismissed without costs."

A decree accordingly was entered dismissing the bill without costs; and the plaintiffs appealed.

The case was argued at the bar in November, 1909, before *Knowlton,* C. J., *Morton, Loring, Braley,* & *Sheldon,* JJ., and afterwards was submitted on briefs to all the justices.

*E. S. Abbott,* for the plaintiffs.

*E. E. Crawshaw,* for the defendant Fred E. Tourtillotte.

SHELDON, J.   All the members of the Tourtillotte family, including both the plaintiffs and the defendant, intended that the title to this burial lot should be taken in the name of the father, the children no doubt expecting to inherit it as heirs at law, in which case they would have held it under the provisions of R. L. c. 78, § 26.   By a mistake, the particulars of which do not appear, the deed was taken in the name of the defendant. This was in July, 1891.   The father died in March, 1895.   The deed had been kept unconcealed in a desk used by and equally accessible to all the members of the family ; but it did not appear that the father ever learned the real state of the title, or that the plaintiffs knew what it was until a year or two after their father's death, that is, in 1896 or 1897.   They then questioned the defendant and he told them that it was all right, that it did not matter, with other similar expressions, which they undoubtedly regarded as amounting to an oral promise to hold the lot for their benefit as well as his own.   But in 1906 he notified the plaintiffs that he claimed an absolute and unconditional title in the lot.   Thereupon they brought this suit.

Upon these facts, it seems to the majority of the court to be clear under our decisions that the bill cannot be maintained. The plaintiffs relied upon mere oral declarations of the defendant.   R. L. c. 147, § 1.   Much as it is to be regretted that he now chooses to make his word of no value, equity cannot enforce it against him.   *Parsons* v. *Phelan,* 134 Mass. 109.   *Collins* v. *Sullivan,* 135 Mass. 461.   *Emerson* v. *Galloupe,* 158 Mass. 146. *Bourke* v. *Callanan,* 160 Mass. 195.   *Rose* v. *Fall River Five Cents Savings Bank,* 165 Mass. 273.   The argument that the enforcement of this general rule works a hardship and enables the defendant to do an injustice to the plaintiffs in this case was stated and answered by Holmes, J., in *Bourke* v. *Callanan, ubi supra.*

It does not matter that the provisions of R. L. c. 74, § 1, cl. 4, or c. 147, § 1, were not set up in the answer.   The bill did not aver any contract or promise by the defendant, except one which was alleged to have been made before the purchase of the lot, and this was not proved.   Apart from this, the bill relies only upon oral declarations of the defendant.   The plaintiffs do not ask for a conveyance.   There was no occasion to plead the

statute of frauds.   It was not pleaded in *Collins* v. *Sullivan, ubi supra.*

We are aware that our decisions above cited have been criticised, and that there are cases in other jurisdictions which tend to sustain the claim of the plaintiffs.   And it is true that equity will often raise a constructive trust to defeat a fraud.   *Moore* v. *Crawford,* 130 U. S. 122, 128.   *Stark* v. *Starrs,* 6 Wall. 402, 409. *Meader* v. *Norton,* 11 Wall. 442, 458.   *Sanford* v. *Sanford,* 139 U. S. 642, 646.   *Ryan* v. *Dox,* 34 N. Y. 307.   *Reitz* v. *Reitz,* 80 N. Y. 538, 540.   *Matthews* v. *Light,* 32 Maine, 305.   *Church* v. *Sterling,* 16 Conn. 388.   *Dodd* v. *Wakeman,* 11 C. E. Green, 484. *Laing* v. *McKee,* 13 Mich. 124.   *Rollins* v. *Mitchell,* 52 Minn. 41.   *Martin* v. *Martin,* 16 B. Mon. 8.   *Cannon* v. *Gilmer,* 135 Ala. 302.   *Alaniz* v. *Casenave,* 91 Cal. 41.   *Lees* v. *Nuttall,* 1 Russ. & M. 53, and on appeal, 2 Myl. & K. 819.   *Taylor* v. *Salmon,* 4 Myl. & Cr. 134.   *Rolfe* v. *Gregory,* 4 DeG., J. & S. 576, 579.   But most of these cases come under the rule of *Tate* v. *Williamson,* L. R. 2 Ch. 55, 61, (see *Hill* v. *Hall,* 191 Mass. 253, 263,) or under that stated by Brayton, C. J., in *Jenckes* v. *Cook,* 9 R. I. 520, 525.   So far as any of them go beyond the rules laid down in our own decisions already referred to, we must abide by the latter.

In the case at bar, the deed by a mistake was made to run to the defendant instead of his father.   If we assume (what has not been found) that this was a mutual mistake of the parties to the deed of such a character and so clearly proved that it might have been corrected in equity at the suit of the father (*Page* v. *Higgins,* 150 Mass. 27 ; *Stockbridge Iron Co.* v. *Hudson Iron Co.* 107 Mass. 290), and that it was not acquiesced in by the father in his lifetime, it yet remains true that the plaintiffs, when in 1896 or 1897 they discovered the mistake, were content to leave it uncorrected, and to rely wholly on the oral representations of their brother.   The case does not come within the rules of *Goode* v. *Riley,* 153 Mass. 585 ; *Canedy* v. *Marcy,* 13 Gray, 373 ; *Mattingly* v. *Speak,* 4 Bush, 316, or *Bohanan* v. *Bohanan,* 3 Ill. App. 502.   And see *Dougan* v. *Bemis,* 95 Minn. 220, and the note to that case in 5 Am. & Eng. Ann. Cas. 255.

The defendant's counsel at the argument in this court con-

sented that the plaintiffs might remove from the lot the family monument placed upon it by one of them. The decree appealed from will be modified so as to allow them to do this, and so modified will be

*Affirmed.*