BENJAMIN F. KENNERSON *vs.* WILLARD G. NASH.

Suffolk. November 28, 1910. — March 9, 1911.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Trust,* Resulting. *Equity Jurisdiction.*

In a suit in equity to compel the defendant to convey to the plaintiff certain land which the defendant was alleged to have purchased with money of the plaintiff under an agreement that he should convey it to the plaintiff, it appeared that, for the purchase of the land, unincumbered, at a sale in foreclosure of a mortgage, the defendant had agreed orally to lend to the plaintiff $1,000, which was the amount which was required to be paid at the time of the sale, and to purchase the land for the plaintiff and then to convey it to the plaintiff, who, by arrangement with the mortgagee, would give him a first mortgage back for the balance of the purchase price and then give to the defendant a second mortgage to secure the advance of the $1,000 and certain other advances to be made by him and debts due from the plaintiff to him and others; that at the foreclosure

sale the defendant was the highest bidder and purchased the land for $28,200, paid the $1,000 required as an immediate payment, at a later date by arrangement with the mortgagee gave back a mortgage for $28,000 to a nominee of the mortgagee for the remainder of the purchase price, and thereafter refused to carry out his oral agreement with the plaintiff. *Held*, that the suit must be dismissed, because the purchase price was not all paid by the plaintiff and therefore there was no resulting trust, and the statute of frauds prevented the enforcement of the oral agreement.

BILL IN EQUITY, filed in the Superior Court on October 28, 1898, and subsequently amended, seeking to establish a resulting trust in favor of the plaintiff in certain land which it was alleged the defendant purchased with the plaintiff's money.

The case was referred to Charles C. Barton, Esquire, as master. The substance of such of his findings as are material to the decision was as follows:

During the year 1897 the plaintiff became the owner in fee of the land in question. In November of that year, he began the erection thereon of two double apartment houses. On August 16, 1897, he mortgaged the premises to one Fallon to secure the payment of $30,500, to be advanced to the plaintiff from time to time to pay off existing mortgages and to pay for labor and material in the construction of the buildings as the work progressed.

In June, 1898, the plaintiff was without further means to complete the buildings, and, as he could not obtain further advances from Fallon, he ceased work thereon. At this time the plaintiff had a large number of creditors to whom he was indebted for material and labor furnished in the construction of the buildings. Many of these creditors had placed attachments and liens on said premises.

The defendant was a dealer in building materials and, at the time the plaintiff ceased work upon the buildings, was a creditor of the plaintiff in the sum of $3,324.86. The plaintiff also was indebted to one Nathan P. Gifford and George A. Gifford, lumber dealers and manufacturers of building finish, for about $1,500. The Giffords declined to make any more advances to the plaintiff until some part of the plaintiff's indebtedness to them had been paid.

On July 18, 1898, Fallon began foreclosure of his mortgage by advertisement of a sale and by making an entry for the purpose

of foreclosure. The sale was advertised to take place on August 5, 1898, but afterwards was adjourned to August 19, 1898. At the sale a cash payment of $1,000 was required to be made.

Nathan P. Gifford, being both willing and able to assist the plaintiff in the completion of the buildings, had a conversation with the plaintiff with that end in view. At that interview the plaintiff told Gifford that the defendant was a large creditor of his and had expressed a willingness to help him, and that the defendant might join with Gifford in helping him complete the buildings.

The manner of holding the title to the premises to protect the defendant and Gifford for the money advanced by him was gone over in interviews between the plaintiff, the defendant and Gifford. One plan was to have a trust deed given. The other plan was to have the foreclosure proceed. The defendant objected to a trust deed on the ground that all the creditors of the plaintiff might not be willing to join. The defendant suggested that the foreclosure proceedings be allowed to go on and the property sold, as by that means all attachments and liens would be cut off. It finally was agreed between the plaintiff and the defendant and Gifford, that the defendant and Gifford would advance, as a loan, to the plaintiff, the money to make the cash payment of $1,000 required at the time of the foreclosure sale and to complete the buildings at an expense, according to estimates obtained, of about $7,000 ; that the plaintiff should obtain some person, acting as a dummy, to bid off the property for him and thereafter give a new mortgage to Fallon, and also to give a second mortgage, subject to Fallon's mortgage, to the defendant and Gifford for the cash payment of $1,000 required to be made at the mortgagee's sale and the $7,000 required for the completion of the buildings and in addition thereto the amounts the plaintiff then owed the defendant and Gifford, with interest at six per cent per annum, and to hold the premises for the plaintiff subject to the mortgages until the plaintiff got a permanent mortgage, or paid the second mortgage, and then to convey the premises to the plaintiff. It was further agreed that the plaintiff should have general charge and superintendence of the buildings in accordance with the original plans. This agreement was not in writing. The plaintiff engaged one Marsh to

bid off the premises at the foreclosure sale, to give the mortgages and to hold the title for him, and on the day to which the mortgagee's sale had been adjourned went with Marsh to the office of the defendant and together with him they went to the premises.

Just before the sale began the defendant notified the plaintiff that he had made up his mind to bid in the premises himself for the plaintiff under the arrangement agreed upon, and that he did not wish to have Marsh bid on the property. The plaintiff, relying on the promise of the defendant that he would bid the property in under the arrangement previously made, directed Marsh not to bid at the sale. About twenty persons attended the sale and several bids were made. Two bids were made by creditors of the plaintiff. The defendant bid $28,200, and, as he was the highest bidder, the auctioneer declared the premises sold to him. He thereupon paid down $1,000 as required by the terms of sale. Gifford did not attend the sale on account of sickness. The defendant previously had agreed to represent him and to advance his part of the purchase money to be paid down in case he was unable to attend the sale. After the sale the defendant arranged with Fallon for a new mortgage to one Rice for $28,000.

On August 24, 1898, Fallon gave a deed of the premises under the power of sale in the mortgage to the defendant, and on the same day the defendant gave back a mortgage on the premises on two months' time for $28,000 to Rice. Rice and Fallon had a joint real estate account. The money lent on the mortgage given to Fallon and the money lent on the mortgage given to Rice came from this joint real estate account. The mortgage was given to Rice rather than to Fallon at the request of Fallon.

" Immediately after the sale the plaintiff told the defendant he would go with him to the defendant's office and have the deeds and other papers made in accordance with the agreements entered into previous to the sale. The defendant told the plaintiff he was too busy to attend to the matter on that day and requested the plaintiff to call the next day when he would attend to it. The plaintiff began to get bids for labor and materials and make arrangements for the completion of the buildings. On the day

after the sale, and from day to day thereafter, the plaintiff called on the defendant at his office and requested that the agreement made previous to the sale should be carried out, and that the deeds and other papers necessary to carry out the agreement should be executed and delivered. The defendant put the plaintiff off from day to day, for about ten days, and finally, when pressed by the plaintiff to execute the deeds and other papers, declined absolutely, and told the plaintiff he should keep the premises for himself. The defendant also told the plaintiff that he never intended to give the plaintiff any interest in the premises. The defendant has held the premises since the conveyance to him, and has taken the rents and profits thereof. He has refused to carry out his agreement with the plaintiff and Gifford."

A final decree in favor of the plaintiff was ordered by *Wait*, J.; and the defendant appealed.

*A. G. Sleeper*, for the defendant.

*E. R. Anderson*, (*G. A. Sweetser* with him,) for the plaintiff.

LORING, J. When A., who has agreed by word of mouth to buy land as an agent for B., betrays his trust and buys it in his own name for his own account, the statute of frauds prevents B. maintaining a bill in equity to have A. decreed to hold the land for him, B. That is settled, at least in this Commonwealth. See *Tourtillotte* v. *Tourtillotte*, 205 Mass. 547, where the earlier cases are collected; in addition to those there cited see *Hall* v. *First National Bank*, 173 Mass. 16. The reasons of this rule and the effect of it are stated with accuracy in *Bourke* v. *Callanan*, 160 Mass. 195, 196, 197.

That in effect has been conceded by the plaintiff in the case at bar, and he has sought to escape from it by making out a resulting trust on the ground that in the case at bar the purchase money was paid by him. But the purchase money was not all paid by him. The purchase money was $1,000 in cash paid on the day of the foreclosure sale (August 19), and a mortgage back for $28,000 given on the day when the defendant received the deed pursuant to the foreclosure sale (August 24). The defendant had agreed to lend the plaintiff the $1,000, and for that reason that sum in legal contemplation might be held to be his money within the doctrine of *Kendall* v. *Mann*, 11 Allen, 15,

acted upon in *McDonough* v. *O'Niel*, 113 Mass. 92. But the mortgage back was made by the defendant, and on the master's report it must be taken that the defendant alone signed the mortgage note. Where the purchase money is made up in part of cash furnished by the plaintiff (but not for an aliquot share) and in part of a mortgage back made by the defendant, there is no resulting trust in favor of the plaintiff. That was decided in *Dudley* v. *Dudley*, 176 Mass. 34, and *Olcott* v. *Bynum*, 17 Wall. 44. It was conceded in *McGowan* v. *McGowan*, 14 Gray, 119 ; and it was one of the grounds of the decision in *Bourke* v. *Callanan*, 160 Mass. 195.

The facts in *McDonough* v. *O'Niel*, 113 Mass. 92, were quite different from those in the case at bar and from those in the cases cited above of *Dudley* v. *Dudley*, *McGowan* v. *McGowan*, *Olcott* v. *Bynum* and *Bourke* v. *Callanan*. In the case of *McDonough* v. *O'Niel*, the purchase price was $3,000. Fifteen hundred dollars of this was paid in cash lent to the plaintiff's testator, and the other $1,500 was paid by a mortgage back made by the defendant to take the place of a mortgage for that amount which was on the land when it was bought by the plaintiff. It is stated in the opinion in *McDonough* v. *O'Niel* that Clements, who held the previous mortgage for $1,500, " testified that before the purchase the defendant came to see if that mortgage could lie on the property, and told him that he was going to buy the land for the testator, and was told by the mortgagee that he must give a new mortgage, as he afterwards did, in discharge of the old one." It is because of this fact that it was said in the subsequent cases of *Bourke* v. *Callanan*, 160 Mass. 195, 196, and *Dudley* v. *Dudley*, 176 Mass. 34, 37, that the purchase in *McDonough* v. *O'Niel* was the purchase of an equity of redemption. No such view however can be taken of the case at bar. The purchase in the case at bar was a purchase at which $1,000 had to be paid in cash on the day of the sale. That means that the balance had to be paid in cash on delivery of the deed. And there is an express finding by the master in the case at bar that " after the sale the defendant arranged with said Fallon for a new mortgage to one Nehemiah W. Rice for twenty-eight thousand dollars ($28,000) " which was the mortgage back. Not only that but under the original arrangement by which the

defendant agreed to lend the plaintiff the $1,000 to be paid down on the day of the foreclosure sale the mortgage back was to be made not by the defendant for the benefit of the plaintiff but by the third person who was to be employed by the plaintiff to buy in the property for the benefit of the plaintiff and the defendant.

On the findings of the master the purchase here in question was a purchase of unincumbered land which the defendant carried through by paying $1,000 which he had agreed to lend to the plaintiff and by giving on his own account a mortgage back for $28,000. In such a case it is settled by the cases cited above that there is no resulting trust in favor of the plaintiff.

The entry must be

*Bill dismissed.*