LEVI M. MARKHAM *et al.*

*v.*

JOSEPH KATZENSTEIN *et al.*

*Opinion filed April 20, 1904—Rehearing denied June 8, 1904.*

1. EQUITY—*pleadings and proof must agree to warrant decree.* Relief cannot be granted where the facts proven do not establish the case made by the allegations of the bill.

2. TRUSTS—*what does not give rise to a trust.* In the absence of fraud, a parol agreement by a stranger, who purchased land which the promisee had lost by failure to redeem, to hold such land for the promisee until the latter should pay the purchase price, with interest, neither time nor manner of payment being fixed, raises no trust enforceable against the Statute of Frauds.

3. STATUTE OF FRAUDS—*when a plea is broad enough to embrace different sections of statute.* A plea stating the legal effect of the Statute of Frauds with reference to parol agreements concerning land, and advising the court that the defendant relies upon the statute, is broad enough to entitle the defendant to the benefit of any section of the statute reasonably within language of the plea.

HAND and SCOTT, JJ., dissenting.

APPEAL from the Circuit Court of McDonough county; the Hon. GEORGE W. THOMPSON, Judge, presiding.

This is a bill filed in the circuit court of McDonough county by appellants, and, as amended, sets up the following facts: That the complainant Sarah Markham is the widow, and the complainants Levi M., William and Dwight Markham are the sons, of Dr. Levi Markham; that on July 1, 1878, Dr. Levi Markham died testate; that prior to his death he, together with his wife, mortgaged the premises in controversy, being one hundred and sixty acres of land in McDonough county, to one Ira T. Smith, and in 1886 the mortgage was foreclosed in the United States Circuit Court for the Southern District of Illinois, and that said Smith became the purchaser at the master's sale, the consideration in the certificate of purchase being $4460.20; that the land was of much greater value than the amount of the mortgage debt; that the com-

plainants were about to sell their equity of redemption in the land to one Harvey Langsford, formerly of said county but since deceased, and that said Langsford had offered to buy the land and pay to complainants about $3000 for their equity of redemption; that one Joseph Katzenstein at the time stated to complainants that if they would not redeem said premises but would permit Smith to obtain a deed to said premises under said sale, then the said Smith would execute a deed to said Katzenstein, and that he, the said Katzenstein, would then deed said premises to complainants whenever complainants would pay the said Katzenstein the amount paid by him to the said Smith, together with interest thereon, at the rate of seven per cent per annum, from the date of said payment by Katzenstein to Smith until complainants should pay said Katzenstein said amount, and that complainants should retain possession of the premises until such redemption; that complainants then and there agreed with Katzenstein that they would accept said proposition, and that in pursuance of said agreement complainants did not redeem said premises; that on the 13th day of February, 1888, the master in chancery of said court made and executed a deed of conveyance of said premises to the said Ira T. Smith, and on the 5th day of April, 1888, Smith made and executed, for the purported consideration of $6400, his deed of conveyance to the said Joseph Katzenstein, and that said Katzenstein then and there agreed with complainants to hold said premises as proposed by him and as stated above; that complainants have retained possession of said premises and made lasting and valuable improvements, and that Katzenstein now claims to be the owner in fee simple of said premises and refuses to convey the premises to complainants; that complainants are willing and ready to pay said Katzenstein the money due him by the terms of the agreement. The bill prays that an accounting may be taken, under the terms of the agreement, with the said Katzen-

stein; that he may be decreed to convey said premises to complainants upon their paying to him the amount found by the court to be due him, and for such other and further relief as equity may require, etc.

Joseph Katzenstein answered, denying all the material allegations of complainants' bill, and setting up the following, being under section 2 of the Statute of Frauds: "Defendant further states that it is provided in and by the Statute of Frauds and Perjuries of this State that no action shall be brought whereby to charge any person upon any contract for the sale of any lands, tenements and hereditaments, or any interest in and concerning the same, unless the agreement upon which such action should be brought, or some memoranda or note in writing, shall be signed by the party to be charged therewith, or some other persons thereunto by him lawfully authorized in writing and signed by such party; and this defendant further states that he did not enter into any writing signed by him, and did not and has not in writing authorized anybody to enter into the alleged contract for him, and states that there is no such contract in writing; and this defendant insists upon said statute, and claims the same benefit as if he had pleaded the same." He further sets up that if the complainants had any such contract as alleged, to purchase said premises, they have been guilty of *laches*, etc., and denies the complainants are entitled to the relief prayed.

Upon a trial of the cause before the chancellor a decree was entered dismissing the bill, from which decree an appeal was prayed and allowed to this court.

SWITZER & MELOAN, (JOSEPH N. CARTER, of counsel,) for appellants:

The second section of the Statute of Frauds set up in Katzenstein's answer is no bar to appellants' bill to establish and enforce this trust, inasmuch as the agreement of Katzenstein was not to sell the said land, or any

209—39

interest in it, to appellants, but to hold it in trust, and to convey to them on the condition agreed upon.

Section 9 of the Statute of Frauds, applicable to this case, not having been pleaded, the parol agreement is enforceable to the same extent as if it had been reduced to writing. *Gordon* v. *Reynolds,* 114 Ill. 118; *Attachment Co.* v. *Machine Co.* 142 id. 171; *Stodder* v. *Hoffman,* 158 id. 490.

A trust may also be implied from the facts and circumstances attending the transaction where there is no actual fraud, and as to all implied trusts the Statute of Frauds has no application, but they may be shown by parol proof. *O'Connor* v. *Mahoney,* 159 Ill. 69; *Fischbeck* v. *Gross,* 112 id. 208; *White* v. *Cannon,* 125 id. 412; *Lantry* v. *Lantry,* 51 id. 458; *Gruhn* v. *Richardson,* 128 id. 178; *Asheford* v. *Willis,* 194 id. 502; *Tritt* v. *Cotzer,* 13 Pa. St. 451.

T. J. Sparks, and Sherman, Tunnicliff & Gumbart, for appellees.

Mr. Justice Ricks delivered the opinion of the court:

Appellants in their bill proceed upon the theory that Smith, the purchaser at the foreclosure sale, held a certificate of purchase of the land in question calling for $4460.20; that the land was of much greater value than the amount called for by the certificate; that complainants had an equity of redemption, and were offered by one Langsford $3000 for that equity, and that Katzenstein, being apprised of the offer of Langsford, stated to complainants that if they would not sell their equity to Langsford, but would permit a deed to issue to Smith and cause Smith to execute a deed to him, Katzenstein, the latter would hold the property in question in trust for appellants, who, upon the payment of the amount paid by Katzenstein, with seven per cent interest, should have a deed from Katzenstein for the land.

The uncontradicted evidence is, that at the time appellants first saw Katzenstein the time of redemption

had expired, and Smith, the purchaser at the foreclosure sale, and who was the mortgagee in the mortgage under which the sale was had, had obtained a deed to the premises. It is also shown, beyond controversy, that at the time appellants approached Katzenstein with a view of interesting him in this property, or at any time during the negotiations between appellants and Katzenstein, the proposal of Langsford to purchase appellants' interests in the property was in no manner mentioned or brought to Katzenstein's knowledge, but, on the contrary, the evidence shows that when appellants sought Katzenstein and endeavored to get him to take the property, they stated that they had been negotiating with one Haines; that appellants had tried to arrange with Smith by which they might lease the lands from him, but Smith declined making a lease, saying that he preferred to and intended to sell the land; that appellants endeavored to get Haines to purchase the land in order that they might lease the same from him, but that Haines, after considering the matter, declined to purchase the land and lease it to appellants. The evidence further discloses that at the time appellants first talked with Katzenstein about the land they informed him that Smith demanded $6400 for it, and that he would take half the purchase money down and a mortgage upon the land to secure the balance. Katzenstein thereupon wrote Smith offering $6200 for the land, which Smith declined, but renewed his statement that he would take $6400 upon the terms above mentioned. Katzenstein then borrowed from his brother $3000, and applied that, together with $400 which he himself had, upon the purchase of the land and gave a mortgage to Smith for $3000 of the purchase price. As soon as Katzenstein had obtained his deed to the land appellants proposed to purchase it, and Katzenstein offered to sell it to them if they would pay him $1000 more than he had paid. This appellants declined to do, and thereupon a lease was executed to Levi M. Markham, one of

the appellants, which was in writing and for the land in question, at the annual rental of $680. This lease was not found and is not in evidence, but its execution is admitted; and that appellant Levi M. Markham, who lived upon the land with all the other appellants as part of the family, acted upon and paid the rent for at least three years under this lease, no question is made. On September 3, 1891, Katzenstein made to Levi M. Markham another lease, in writing, for the same land from March 1, 1892, to March 1, 1893, at an annual rental of $720, and the evidence shows that appellants held under this lease from that time to 1898 and paid rent according to its terms. By this latter lease the tenant was to keep the fences and appurtenances in repair at his own expense. In the years 1895 and 1896 the rent was in arrear, and Katzenstein served notice upon Levi M. Markham and brought forcible detainer, under the statute, for failure to pay rent. The suit of 1895, upon the day set for trial, was continued and afterwards dismissed, and the suit of 1896 went to judgment, but the evidence shows that both of these suits were settled by Markham paying the rent and paying Katzenstein's lawyer his fee and the costs of the court. In April, 1898, another lease was executed between Katzenstein and appellant Levi M. Markham for the same premises for the rental of $720, containing a condition that on failure of the tenant to pay the rent when due, $80 should be added to the rent. The Markhams held under this lease until February, 1902, when a lease between Katzenstein and William Markham and Levi M. Markham was prepared and was taken by appellants to their home to sign and return, and was kept by them but not returned. By this lease the rental was fixed at $800, and the undisputed evidence is that after the making of it, and up to the time of the bringing of this suit, the Markhams, as tenants, paid rent according to the terms of this unsigned lease.

The matters relied upon by appellants to overcome the unquestioned facts above stated are, first, the testimony of appellants Sarah Markham and her son, Levi M., to the effect that they were together when they had the first interview with Katzenstein in reference to this transaction, and that Katzenstein there agreed that he would furnish the money and take the title from Smith and hold the title in trust for appellants, and that upon the payment by the latter to Katzenstein of the amount paid by him, and seven per cent interest, the appellants should have a deed from Katzenstein to the land. These two witnesses testified to a conversation, both before and after obtaining the deed from Smith, to the effect above stated. This conversation is absolutely denied by Katzenstein and by one Jacobs, who was a clerk in Katzenstein's store at the time the transaction took place. Katzenstein says, and is corroborated by Jacobs in the statement, that appellant Sarah Markham alone came to the store to see him and get him to purchase the land in controversy, and proposed to him to purchase it and hold it for appellants and permit them to pay him the amount he had paid and seven per cent interest and redeem the land, but that Katzenstein positively refused to go into such transaction, and stated that if he bought the land at all he would buy it for himself, and that if the appellants wished to occupy it as tenants and would pay the rent they could do so, and that Mrs. Markham then expressed the desire that Katzenstein should go ahead and purchase the land and they would become his tenants and try to pay the rent. Appellants further rely upon alleged declarations of Katzenstein, made to numerous persons during the period between the time of the purchase of the land by Katzenstein and the bringing of the suit, that appellants were to have the land whenever they paid for it, and remarks of similar import; but a careful review of the record shows that these remarks were of such equivocal character and made un-

der such conditions and surroundings that little weight can be attributed to them. Appellants further rely upon what they allege to be a part performance, in that they have, as they say, paid the interest according to the agreement, paid taxes and placed permanent and valuable improvements upon the land. With reference to the payment of interest, it must be said, under the facts in this record, such a claim is exceedingly weak. The interest on $6400 would be .$448, and $100 per year for taxes would be an excessive amount, and upon this basis, by the first lease, appellants paid $132 in excess of interest and taxes, and by the second lease, under which they paid $720 a year, they paid $172 in excess, and by the last lease they were paying at the rate of $252 in excess of interest and taxes, and the evidence shows that they at no time paid any part of the taxes. The taxes were always and regularly paid by Katzenstein.

Appellants who were not parties to the leases attempt to say that they had no knowledge of the existence of the leases, and that they thought they were holding under the original agreement as testified to by them. This testimony cannot be credited or believed by any reasonable mind, in the light of all the evidence. Two of the sons, William and Levi, were adults at the time of this purchase by Katzenstein. Dwight, another of the sons, was a minor, then of the age of sixteen or eighteen years. By their father's will this land was devised to these three boys. The widow, Sarah, was to occupy and control it until Dwight should become of age, and then the three boys were to take the land and pay to their sisters certain sums of money made charges upon the land. William was in debt and executions were hanging over him at the time of the first lease, and it is evident that the lease was made to Levi M. in order that the farm might be conducted and the crops be undisturbed by the creditors of William. They all lived upon the land together and in the same house, and the undisputed evi-

dence is that practically all the crops were sold or disposed of in the name of Katzenstein, and to say that for thirteen or fourteen years this course of business could be kept up by a family of ordinary intelligence without each member being apprised of the way the business was being conducted would be to unreasonably tax credulity.

The improvements testified to were the building of a summer kitchen at a cost of $30; the building of a barn, the material of which cost $100, outside of what was gotten off of the farm itself; building a string of fence between the farm in question and an adjoining farm, and the planting of some fruit trees. As we have seen, the lease of 1891 required that Levi M. Markham should keep up the fence and appurtenances at his own cost. The evidence shows that there was an old stable upon the premises which had practically rotted down, and some material was gotten on the farm and $100 worth of lumber bought, and in the course of two or three years a stable or barn was built. Levi Markham testified that the total value of the improvements placed by him on the farm was from $500 to $600, but the items of the improvements as shown by him amount to but little more than half of that amount, and the evidence tends to show that $300 or $400 would be a high estimate of the value of the improvements, taking their first cost.

Levi M. Markham and Sarah Markham both testified that immediately after Katzenstein obtained his deed to the land they wanted him to enter into a writing by which he would agree that upon the payment to him, by them, of the amount paid by him, and seven per cent interest, they should have a deed to the land, and that he declined to do this unless they would pay him $1000 in excess of the amount he had paid, and that they refused to pay that amount. Appellants further claim that they are supported in their contentions by the fact that the land was worth from $1600 to $3000 more at the time Katzenstein purchased it than he gave for it, and they

have offered evidence which tends very strongly, so far as testimony and opinions of people can do, to show that it was worth anywhere from $1000 to $3000 more than Katzenstein paid for it. This evidence would have very great weight were it not for the fact that the record shows, beyond question, that the deed was made to Smith in February, 1888. His certificate of purchase only required the payment of $4460.20, and interest, to enable appellants to redeem from that sale. The deed was taken reasonably promptly after the time of redemption had expired. Within a few months, then, of the time Smith did get his deed for this land for $5000 or less a redemption could have been made from the sale to Smith, and if this land were worth as much more as the witnesses testified and as appellants now claim, it is indeed remarkable that they could find no one who would furnish the money and enable them to redeem the land, taking it as security, and the fact that they did not and could not find anyone who would furnish the money to redeem from the sale, when it was only $4460.20 and interest, tends to controvert their position and contention now, that Katzenstein would pay $6400 for the land, borrow $3000 with which to do so, give a mortgage upon the land for the amount remaining unpaid, and give appellants the opportunity to redeem upon the terms they claim he did.

If the case stated in the bill had been established by the evidence there would be no question of the right of appellants to relief. A constructive trust would then be established under the rule announced in *Lantry* v. *Lantry*, 51 Ill. 458, *Biggins* v. *Biggins*, 133 id. 211, and *Fischbeck* v. *Gross*, 112 id. 208. It is entirely clear that neither the bill nor the evidence tends to establish a resulting trust, as no part of the purchase money was ever paid by appellants. As we view the evidence, it wholly fails to support the allegations of the bill. Instead of appellants having an equity in the property at the time of the alleged agreement with Katzenstein, the equity had been

swept away, and Smith, the purchaser at the mortgage sale, had a good and valid deed conveying absolute title; and instead of the evidence supporting the allegation of the bill that Langsford was about to redeem the property from the sale and give appellants $3000 for their equity, and that Katzenstein, with a knowledge of that offer, had induced appellants to decline the offer of Langsford and accept the offer they impute to him, the evidence distinctly shows that in the first place there was no equity for which Langsford could pay $3000, and in the next place there was no communication to Katzenstein of any offer on the part of Langsford or any negotiations between him and appellants, and instead of appellants paying interest, as they allege, they paid rent for the lands, the rents increasing as the value of the lands increased. It is a well known fact that since 1888 money has been more plentiful and interest has, in the main, decreased, and yet, upon the theory that appellants were paying interest on $6400 at seven per cent, every lease that was made was for a practical increase of every annual payment.

According to appellants' own testimony the case was simply one in which Katzenstein agreed to buy land in which appellants no longer had any interest, giving his note and mortgage and money for the purchase of it, taking a deed to himself, and agreeing to hold it in trust, as appellants claim, until they should pay the purchase price, with seven per cent interest. No time was fixed within which the money should be paid and no manner of payment agreed upon. From such a transaction as this can it be said that a trust arises in any form? We think not. There must be some relation existing between the parties, and the party claiming the benefit of the trust must bear such a relation to the property out of which the trust is supposed to arise, that, taking into consideration the relations of the parties claiming the benefit of the trust to the property itself and the agree-

ment of the party who shall stand in the position of a trustee, to permit the latter to deny the trust or refuse to perform its conditions would be more than a mere moral wrong, but would amount to legal fraud.

Mr. Pomeroy, in his work on Equity, after discussing the conditions under which trusts *ex maleficio* arise, says: "The foregoing cases should be carefully distinguished from those in which there is a mere verbal promise to purchase and convey land. In order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the Statute of Frauds would be virtually abrogated. There must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute. It endeavors to prevent and punish fraud by taking from the wrongdoer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts." (2 Pomeroy's Eq. Jur. sec. 1056.)

In *Lantry* v. *Lantry, supra*, it is said (p. 465): "If A voluntarily conveys land to B, the latter having taken no measures to procure the conveyance, but accepting it and verbally promising to hold the property in trust for C, the case falls within the statute, and chancery will not enforce the parol promise. But if A was intending to convey the land directly to C, and B interposed and advised A not to convey directly to C but to convey to him, promising, if A would do so, he, B, would hold the land in trust for C, chancery will lend its aid to enforce the trust upon the ground that B obtained the title by fraud and imposition upon A." To the same effect are *Biggins* v. *Biggins, supra; Stevenson* v. *Crapnell*, 114 Ill. 19; *Gruhn* v. *Richardson*, 128 id. 178; *Levy* v. *Brush*, 45 N. Y. 589; *Wheeler* v. *Reynolds*, 66 id. 228.

There is no diversity of opinion that a mere parol agreement for the conveyance of land is void both at law and in equity, but where it appears that the agreement was the result of the fraud of a person holding the land and refusing to convey, equity, upon the ground of fraud, assumes jurisdiction and grants relief. *Wheeler* v. *Reynolds, supra.*

It is said, however, that a verbal agreement to convey land is good, and may be enforced unless the Statute of Frauds is pleaded or relied upon, and that the appellee Katzenstein, in the case at bar, has pleaded the wrong section of the statute, and it is asserted that he has pleaded the second section of the statute when he should have pleaded the ninth section, which is said, and appears by the said statute, to relate more particularly to trusts. It must be first said that appellants have not made the case stated in their bill, but have sought to make another case. It is so well established by the laws of this State that the rule is no longer questioned, that in order to have relief in equity the proof must establish the case made by the bill, and though a case may be shown by the evidence which, if alleged in the bill, would have entitled the party to relief, still the relief cannot be granted where the allegations of the bill will not support it, and this bill could well have been dismissed upon the ground that the case sought to be made by the evidence was not the case alleged in the bill.

Nor do we think the contention that appellee Katzenstein should not have the benefit of the Statute of Frauds because section 2 instead of section 9 was pleaded should be sustained. The whole agreement relied upon here and tending to support which there is any evidence, is a parol agreement to convey land, in which, as we think, there is such absence of fraud as fails to create the relation of the parties that of a trust relation. Section 9 of the Statute of Frauds is: "All declarations or creations of trusts or confidences of any lands, tenements or heredit-

aments, shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will in writing; or else they shall be utterly void and of no effect: *Provided*, that resulting trusts or trusts created by construction, implication or operation of law, need not be in writing, and the same may be proved by parol."

The only class of trusts to which the statute does not apply, as expressly provided by its terms, are resulting trusts. The answer of Katzenstein states: "It is provided in and by the Statute of Frauds and Perjuries of this State that no action shall be brought whereby to charge any person upon any contract for the sale of any lands, tenements or hereditaments, or any interest in and concerning the same, unless the agreement upon which such action should be brought, or some memoranda or note in writing, shall be signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing and signed by such party; and this defendant further states that he did not enter into any writing signed by him, and did not and has not in writing authorized anybody to enter into the alleged contract for him, and states that there is no such contract in writing; and this defendant insists upon said statute, and claims the same benefit as if he had pleaded the same."

We think the language used in the answer, while it is substantially the language of the second clause of the Statute of Frauds, is broad enough to cover the rights insisted upon in this case, whether they should be construed to be rights arising from a trust, or otherwise. No particular section is designated by the answer, but the defendant therein states the legal effect of the Statute of Frauds and advises the court that he relies upon that statute, and it is our opinion that such a plea or statement in the answer is sufficiently broad to entitle the defendant to the benefit of any section of the statute

coming reasonably within the language of the plea or answer. *Bogardus* v. *Trinity Church*, 4 Paige, (N. Y.) 197.

It is also insisted in the answer that appellants were guilty of *laches*, and under the evidence in this case and in view of all the circumstances as shown, if the decree in question had been predicated upon *laches* alone we would not have felt at liberty to disturb it.

A careful consideration of this record leads us to the conclusion that the decree of the circuit court dismissing appellants' bill was right, and should be and is affirmed.

*Decree affirmed.*

HAND and SCOTT, JJ., dissenting.