BRADLEY *v.* TALARICO.

[No. 18,949. Filed October 27, 1958. Rehearing denied December 30, 1958. Transfer denied June 4, 1959.]

*Taylor, Allen, Matthews & Gay, Leo L. Cook* and *Harry S. Taylor,* all of South Bend, for appellant.

*Jones, Obenchain & Ford* and *James H. Pankow,* both of South Bend, for appellee.

COOPER, J.—By complaint in two paragraphs, appellant brought action against appellee for possession of certain real estate and damages for wrongful possession thereof. In addition to appropriate answers to the complaint, appellee filed a counter-claim, alleging, in substance:

That he had purchased said real estate on May 1, 1941, for Four Thousand, Five Hundred ($4,500.00) Dollars, making a down payment thereon of One Hundred ($100.00) Dollars; that at said time, appellee and one Samuel Rubinstein (deceased October 10, 1945, and from whose heirs appellant alleges title) made an oral agreement whereby said Rubinstein was to pay the balance of said purchase price as a loan to appellee; that said loan was to be repaid at the rate of Forty ($40.00) Dollars per month and the title to the real estate was to be held by Rubinstein in trust for appellee and as security for said loan;

that from August, 1941, to October 10, 1945, the date of Rubinstein's death, appellee paid the latter Forty ($40.00) Dollars per month, and from October 10, 1945, to October, 1954, he paid said monthly payments to said decedent's widow or to the Bremen State Bank; that pursuant to said agreement, appellee has paid the total sum of Six Thousand, One Hundred and Sixty ($6,160.00) Dollars. Wherefore, appellee demands an accounting and a deed from appellant or a court-appointed successor trustee, costs, and all further proper relief.

The issues were submitted to the court, without a jury. Finding and judgment against appellant on his complaint and for appellee on his counter-claim, except the prayer for an accounting, was duly entered by the court. Appellant attacks the decision of the court on the specified grounds that it is not sustained by sufficient evidence and is contrary to law.

A resulting trust under the Statute may arise from any one of three conditions, namely (1) Where a conveyance is taken in the name of the alienee without the consent of the party paying the purchase money; (2) Where the alienee, in violation of some trust, has purchased the land with money not his own; (3) Where, by agreement, the party to whom the conveyance was made was to hold the land in trust for the party paying the purchase money or some part thereof. Burns' Ind. Stat., §56-608, 1951 Replacement.

The records disclose no evidence to sustain either of the first two conditions. To establish a resulting trust under the third condition, the burden was on the appellee to offer clear and convincing proof thereof, and such as unequivocally and unmistakably established such trust. See *Costa et al.*

v. *Costa et al.* (1953), 124 Ind. App. 128, 133, 134, 115 N. E. 2d 516; *Vonville* v. *Dexter* (1948) (T. D. 1948), 118 Ind. App. 187, 77 N. E. 2d 259; *Rickes* v. *Rickes* (1923) (T. D. 1924) 81 Ind. App. 533, 141 N. E. 486; *Koehler* v. *Koehler* (1919) (T. D. 1921), 75 Ind. App. 510, 121 N. E. 450.

In the case of *Costa et al.* v. *Costa et al.*, *supra*, this court stated:

"It is a well-established rule of law that to constitute a trust such as alleged by the appellants, the terms thereof must be certainly and definitely established." (See also *Bullerdick* v. *Miller* (1926), 85 Ind. App. 369, 152 N. E. 280.

The record before us reflects that all of the material evidence introduced by the appellee to sustain the averments of his counter-claim was parol. Our court has always held that to sustain a trust relation by oral evidence, the proof thereof must be clear and distinct and that the standard of evidence for such purpose is a superior measure of proof. As stated in the Costa case, *supra*, and authorities cited, "The evidence must be higher in quality to substantiate the same—that is, in clearness, fullness and persuasiveness," and, in the case of *Vonville* v. *Dexter*, *supra*, at page 208, it is said that, *"In equitable actions of this nature the rule is that 'While a resulting trust may be established by parol evidence*: (our emphasis) It is settled by a complete unanimity of decisions that *such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged benficiary beyond a doubt.'"*

The record clearly shows that the evidence introduced by the appellee is not of such high quality as to substantiate the averments of his counter-claim

with the clearness, fullness, and persuasiveness required by our courts. The oral testimony tends to establish no more than mere statements as to what the decedent Rubinstein was going to do or what he was thinking about doing prior to the time he contracted for the purchase of the property in question, and, prior to the time he paid the balance due on the contract and took the deed on 3/7/42, and executed a mortgage to the Bremen State Bank on 6/4/42.

A condensed recital of the evidence in the record before us is as follows:

Appellee's first witness said that Rubinstein had told him in 1942 that "he was thinking of buying a house" for appellee and that this property was then in the process of being purchased; that in October, 1942, Rubinstein told him he had purchased "this house" and was taking the deed in his name and would pay the interest, taxes, and upkeep expenses in order to take credit for income tax purposes; that appellee was going to pay him Forty ($40.00) Dollars per month until the house was paid for.

The next witness (a brother of decedent) testified that his brother, Samuel, had said he was buying a house for appellee "to live in"; that he wanted to make appellee "happy"; saw property but once and Sam called it appellee's house "a hundred times"; that his conversation with Sam was two or three years before 1942 and concerned "a home, but not any particular property"; that in the course of two to three years there had been a "hundred" discussions "about a home, but no particular home"; that he told Rubinstein to make it easy for Joe and the former answered, "Leave it to me, I will take care of it."

The next witness was a business associate of decedent; that he said beginning in 1940, Rubinstein

suggested using appellee as a plant superintendent and various conversations went on about "arranging living quarters for 'appellee to be financed by Rubinstein' or the wall paper company"; that the day after Rubinstein purchased the house he told the witness he had paid $4500.00 and Joe was to pay back at $40.00 per month; that he had visited the house once and Rubinstein call it "Joe's home"; that he doesn't know whether Rubinstein used his "own" or "corporation funds" in buying the house; that the property was first financed through a South Bend bank and then the loan was transferred to the Bremen bank.

The succeeding witness testified that he and Rubinstein drove from Chicago to South Bend when the deal for the property was made; that Rubinstein stated to him that Joe had found a home he was interested in and Rubinstein was coming down to arrange the financing and called the place "Joe's house." A real estate broker was the next witness and said he was acting as the agent in making sale of 722 East Pennsylvania Street; that he received $100.00 from appellee and gave a receipt of part payment.

An employee at Rubinstein's Wall Paper Company then testified that a few days before Rubinstein's death he overheard a conversation between decedent and appellee in which the latter asked the former "what he was going to do about the house" and Rubinstein replied that "he was going to make a deal for Kenny and then would straighten it out for 'appellee'"; that appellee wanted him to write "something on paper" until "you get the right papers fixed up" and Rubinstein replied "What the heck, nothing is going to happen to me."

Appellee testified that he came from Joliet to work for Rubinstein in 1939 and moved his family to South Bend the same year; that until 1940 he lived in a rented house, got a notice to move, and Rubinstein told him to look for a home so he wouldn't be put out any more, and he looked at the house now in dispute and in April, 1941, Rubinstein told him he would talk to Chalstrom (Rubinstein's business associate and owner, or held interest therein) "to see whether or not he (Chalstrom) would go along with him (Rubinstein), so they would put the down payment on the house for me"; that later Rubinstein told him he would have the property put in his own name for income tax purposes; that the property was purchased on land contract first for Forty Five Hundred ($4500.00) Dollars, witness to make payments of Forty ($40.00) Dollars per month until price was paid, Rubinstein to take care of taxes, interest, and insurance; that witness' wages were increased Twenty Five ($25.00) Dollars per month so he could make payment; that he made his payments first to two different South Bend banks and then to a Bremen bank; that Rubinstein always referred to the house as "your house"; that the bank payments were entered in "pass" books of Rubinstein and after the latter's death, he paid Mrs. Rubinstein by "money orders" of which he has coupons but no other form of receipts; that after Rubinstein's death, Mrs. Rubinstein had called to know the status of the house appellee was living in and who was the owner and appellee "told her of his agreement with Rubinstein."

The last witness for appellee was the wife of appellant and daughter of Rubinstein. Her testimony referred only to a letter received October 1, 1954, from an attorney for appellee in which the attorney

asserted appellee's claim to the property and demanded a deed.

The documentary evidence exhibits two letters from appellee to the widow of Rubinstein, dated in 1954, nine years after the said Rubinstein's death and more than twelve years after the purchase of the said real estate by Rubinstein. Said letters appear as follows:

"South Bend Ind
April 19 1954

"Dear Sarah

"*Enclosed is rent payment*, also enclosed is a form from insurance company, which came to me, but is for you to sign on wind damage claim. I called three roofing companies and they said they would come out but only one came out to look at the roof. he said it is nearly impossible to patch as the roof is completely worn out. the stone is just about all off of the shingles. He thought if you could get an adjustment from the insurance company it would pay to put the roof on now. it sure is a fire hazard the way it is. There must be about 100 shingles broke off where one meets the other. The roofing man said he would write to you & explain it to you.

Best regards

Joe"

(Our emphasis)

"July 17, 1954

"Dear Sarah :-

"Enclosed is money order *for rent*. Sarah, the house needs a paint job very much, it also needs a new roof, every time we have a wind, some of the roof shingles break off, they are very brittle. I have redecorated the inside again sanded the floors & put new plaster in the living room & dinging room, it looks very nice, we did it ourselves, my nephews from Joliet came up & helped me with it Sarah, once before I wrote you about trying to settle about the house, which you turned over to your lawyer. Sarah I wasn't lying then and am not now, your lawyer asked me to get my

lawyer in So. Bend as you wanted to settle about the house,
(over)

P. S. Did you know my brother Fred died Christmas morning. he had another heart attack

however your lawyer, Mr. Robison wrote me & asked if I had any signed contract about the house, which of course I don't.

"Also, I have spent a very large amount of money on the upkeep of the house, I have bought screens & storm sash; new aluminum eaves troughs, sewer cleaned three times, new linoleum & table tops in the kitchen and all other repairs. *I can't see my way clear to continue to put money in the house, unless we can come to some agreement on it.*

"As you know, not too long after Sams death I suffered a nervous breakdown, it was due mostly, to thinking about Sam and my status with the house. As you know these doctors ask you a lot of questions as to what is bothering you & I told him about the house and the situation I am in, his advice was for me to try to settle it one way or another, this is the main reason I am writing you. *If the price is right and you want to sell it, I would like to buy it from you, I really would like to come to an agreement on it.*

"Best Regards & Hoping to hear from you soon, I remain yours

Joe Talarico"

(Our emphasis)

The foregoing letters are unchallenged and are not met by any contradictory evidence. It appears therefrom that the appellee was paying rent for the use and occupancy of the real estate, and that he claimed to have spent money on the up-keep of the house. However, his statement that "If the price is right and you want to sell it I would like to buy it from you—

I really would like to come to an agreement on it", clearly establishes there being no other evidence contrary thereto, that for a period of approximately twelve years after the death of the said Rubinstein, the appellee had not asserted or claimed that he had an agreement with Rubinstein to hold the land in trust for him nor that appellee had paid the purchase money or was paying the purchase money pursuant to any agreement with Rubinstein. These facts place this case squarely within the general rule of law that parol evidence of facts giving rise to resulting trusts must be received with caution.

" . . . So reluctant are the courts to ingraft a trust by parol on the legal title to real estate, or to enforce an alleged parol trust in personal property, that there is perhaps no better-established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence. This rule requiring an extraordinary degree or certainty of proof in this class of cases has been applied or recognized in practically all jurisdictions, but with a wide variety of statements regarding the kind of testimony essential to establish the trust. It has been said that there is perhaps no fact which, in the trial of civil causes, is required to be so satisfactorily proved as that which ingrafts a parol trust upon a legal title.

"*The courts are particularly emphatic in the statements and application of the rule where there has been delay in the assertion of the trust against one having legal title, resulting in difficulty in procuring witnesses and in establishing a defense, especially where the trust is based on communications or transactions with a person since deceased.*" 54 Am. Jur. 478, §620. (Our emphasis)

Measured by the above-announced doctrine of our court, as found in the Costa and Vonville cases, *supra,*

the evidence in this record falls far short of being "clear, strong, unequivocal, unmistakable" and most certainly it fails to establish "beyond a doubt" the fact of payment for the property by appellee. Samuel Rubinstein died October 10, 1945, and his widow then inquired as to the status of the property and, appellee says, she was told of "his agreement with Rubinstein". Yet, as late as April and July in 1954, appellee, as shown by his own written letters, was making "rent" payments and making overtures to "buy" the property from the widow if an agreement could be reached. Without in any sense weighing the evidence, we think that accepting all the evidence most favorable to the appellee, and all legitimate inferences therefrom, the latter has failed to establish a resulting trust by the superior measure of proof required by the declared doctrines of our courts, above referred to. As a consequence the judgment appealed from is, in our opinion, contrary to law and unsupported by sufficient evidence.

Judgment reversed and cause remanded with instructions to grant the appellant's motion for a new trial.

NOTE.—Reported in 153 N. E. 2d 505.