## SCHWAB *v.* SCHWAB

[No. 19,012. Filed November 16, 1959.]

110

*Curtis W. Roll,* of Kokomo, for appellant.

*Brown, Reller, Mendenhall & Kleinknecht* and *Paul S. Mendenhall,* of Richmond, for appellee.

KELLEY, J.—The complaint of the appellee is for the recovery of the possession of real estate and is in the usual form. The appellant answered in denial, and also filed a counter-claim.

The counter-claim alleges, in substance, that the appellant and appellee are brothers; that prior to June 9, 1952, one John M. Harlan was the owner of the land described in the complaint; that prior to said date appellant desired to purchase the real estate from said owner; that prior to June 9, 1952, "it was agreed" between appellant and appellee "that said real estate

would be purchased from said John M. Harlan"; that appellee "would take title to said real estate" in appellee's "own name"; that appellant "would furnish the consideration" for the purchase of said real estate and that appellee would hold record title to said real estate "for the use and benefit and in trust, for and on behalf" of appellant; that said real estate was purchased from said owner, "said title being taken in the name of the plaintiff (appellee), and that defendant (appellant) herein furnished the consideration therefor"; that there was a valuable consideration for said agreement and said agreement "was free from fraud in any particular"; that appellee seeks possession of the premises in violation of his trust to appellant's damage in the sum of $500.00. The prayer is that appellee be denied possession of the real estate, that a trust be decreed in favor of appellant, and for $500.00 damages. Appellee denied the allegations of the counterclaim.

The court found for the appellee and "against" the appellant and that appellee is the owner of and entitled to the possession of the real estate. Judgment for appellee.

The questions presented for decision herein arise upon the following facts which we deem established by the evidence favorable to the judgment:

The appellant and appellee are brothers. By inference it appears that appellant was the former owner of the real estate involved. He lived thereon from 1936 to the time of the trial on July 12, 1956. Appellant became indebted to one Charles Partlow, which indebtedness was secured by a mortgage on the real estate. On April 24, 1951, the latter obtained a judgment against appellant with decree of foreclosure of the mortgage; the judgment was thereafter assigned to said John M.

Harlan and pursuant to the foreclosure proceedings, the said John M. Harlan received, and duly recorded, the Sheriff's Deed conveying said real estate to him. Thereafter appellant unsuccessfully endeavored to arrange with Harlan for the purchase of the property. He then sought a loan at a local bank for funds with which to pay Harlan for the property but appellant's wife, who was a party to then pending divorce proceedings between them, refused to execute the necessary papers and the solicited loan was never consummated.

Thereafter, on June 9, 1952 appellee obtained a loan of $1210.00 from a bank in Richmond, Indiana, and executed his personal note therefor, secured by a mortgage on the real estate, payable at the rate of $35.00 per month over a period of three years. With the money so obtained, being $1000.00, (the $210.00 representing advance interest to the bank) appellee purchased the real estate from the said John M. Harlan, who conveyed the same to the appellee. No part of the consideration for the deed was paid by appellant, the entire consideration being supplied by means of the said loan made by appellee. The bank payment book was sent to the address where appellant lived instead of to the address of appellee. This is unexplained except by appellee's statement that "they must have thought that I lived there, and they sent these here—." Appellant made the first payment and from that time appellant made some payments and appellee made some. The payments made by appellant totalled "around seven hundred dollars." There was no rental agreement between appellant and appellee and appellee testified that he "figured" that the payments made on the mortgage by appellant were "for the use of the property." In the fall of 1952, payments to the bank became delinquent and appellee was notified that the bank was look-

ing to him for the payments. Appellee paid up the delinquency. Again in June of 1953, appellee was notified by the bank that the payments were delinquent and appellee paid up. Thereafter appellee maintained the payments on a reasonably current basis. There is evidence that appellant made no payments during the three years prior to the trial. In April of 1954, the loan, then approximating a balance of $60.74, was paid off by appellee and the loan renewed in the face amount of $610.74, representing, apparently, the payment of the $60.74 balance on the old loan, $139.00 interest to the bank, and cash remittance of $411.00. In September or November of 1954, the loan was paid off by appellee, apparently (the evidence is extremely meager, confused, and indefinite) from funds he obtained on a loan from the West End Building and Loan.

At the time appellee purchased the real estate and secured the deed therefor, the taxes thereon were delinquent for a period of some two years and advertisement for sale for the delinquencies was to be made the following week. Appellee paid said taxes and thereby avoided the tax sale. Appellee continued to pay the taxes thereafter. (Appellant contests this on the ground of a stipulation which he says shows that appellee paid only $44.00 for taxes since June 9, 1952. It is clear, however, from all the pertinent evidence that said stipulation had reference to the first payment of a sewer assessment).

Appellant put some improvements on the property without any agreement or arrangement with appellee. There is evidence indicating that appellee knew that appellant "was working around over there. . . . I knew he started on that two rooms down there. It went slow, a board or two at a time." As to the sewer appellant said he put in, appellee testified he did not

know it "until after it was put in." Appellant and appellee, as brothers, were on friendly terms until the fall of 1954, at which time appellee had an altercation with appellant's wife, since which time appellee and appellant have ceased to converse with each other.

Appellant held the burden of proving the allegations of his counterclaim that he agreed with appellee that the latter would take the title to the real estate in his own name in trust for appellant and that appellant furnished the consideration therefor. As the decision of the court was adverse to appellant on the counterclaim, the specification in his motion for a new trial that the decision is not sustained by sufficient evidence is unavailing to him. Appellant, therefore, must establish that the decision is contrary to law, that is, that the court denied him relief to which the evidence entitled him. *Wadler* v. *Mogul Rubber Corporation et al.* (1945), 116 Ind. App. 152, 154, 61 N. E. 2d 472; *Wilson, Admx.* v. *Rollings* (1938), 214 Ind. 155, 14 N. E. 2d 905. The evidence thus far recited wholly fails to establish any agreement between appellee and appellant that the former was to take and hold the title to the real estate in trust for the latter or that appellant furnished or supplied any part of the consideration paid to Harlan for the property. Appellant, however, insists that there is evidence sufficient to establish such agreement between the parties and that the court should have so found.

He suggests that a certain part of the testimony of Mr. Harlan from whom appellee purchased the real estate, showed that there was an agreement between appellant and appellee to the effect contended for. In particular, appellant emphatically states in his brief that Mr. Harlan said that "At the bank he heard a conversation between Charles and Harry Schwab to the

effect that Charles was to take title to the property, to hold the same in trust for Harry." The record reveals the following pertinent portions of the testimony of Mr. Harlan bearing on the subject matter now under consideration:

### DIRECT EXAMINATION BY APPELLEE

. . .

Q. "Did you hear any conversation between Charles Schwab and Harry Schwab to the effect that Charles Schwab was to take title to the property, to hold the same in trust for Harry Schwab?

A. I can not now recall who was present at such conversation. I do remember that *I was told* that these brothers *had worked something out.*

Q. By whom were you told?

A. I believe—I am trying to recall the exact situation. To be right frank about it, I am not sure whether I was told by Mr. Stoner or by one of the parties to this action.

Q. You have no specific recollection of any definite conversation that you can tell the court about, then?

A. I can not place any conversation, no."

### CROSS-EXAMINATION BY APPELLANT

Question by the Court

. . .

Q. "Did you have any conversation with this man, Charles Schwab, about an agreement between him and his brother, as to who was to pay the money to buy this place, and who was to take title, and what for? Do you recall any such conversation? Do you remember what they said?

A. I know that, in the course of events in this transaction, I did have some conversation with the gentlemen here.

Q. Charles Schwab?

A. Yes.

Q. The plaintiff, the man that borrowed the money from the bank?

A. That's right.

. . .

Q. So he paid the purchase money by borrowing the money from the bank, and he put the mortgage on it, and the deed was made to him?

A. That's right. I can not now pinpoint any conversation as to who was present at the time. There were perhaps a half dozen conversations about this thing, and then there was a lull in which I heard nothing until Stoner, at the Second National Bank called me.

Q. This defendant, Harry Schwab—do you know of him paying anything?

A. No, I don't.

Q. All you know is the money came from the bank?

A. That's right.

. . .

Q. You know no money came to you from this defendant?

A. That's right.

Q. You don't have any knowledge of him putting up any of the purchase price for these lots?

A. I do not."

. . .

## QUESTIONS BY APPELLANT

Q. "You can remember no specific conversation with either the plaintiff or defendant in this matter here. I believe you said, on direct examination, you can remember talking at one time with Harry, but, as far as remembering any specific conversation, you are not able to say it. Is that correct?

A. That's right. I only remember the gist of the conversations. I do not now recall whether I had two or four, or how many conversations it might have been."

We have burdened this opinion with a somewhat more detailed and extensive delineation of the referred to testimony than is usual. This is attributable to the heavy reliance thereon by appellant. However, it is clear, under the authorities hereinafter mentioned, that said evidence given by the witness, Harlan, fails wholly to establish the asserted agreement of the parties. Appellant further refers to his own testimony to the effect that he tried to make a loan at the bank but was unable to do so because his wife would not sign the loan papers; that he and appellee discussed "the possibility of his buying this property" and "if we would let it go in his name, I would pay it off"; that "I would pay the bank off. I would make all the payments up there at the bank"; that the matter of a written agreement between them was brought up and appellee said there was no need of it and that "you trust me" and appellant said "That's right." Appellant sums up, "as a fair deduction from the evidence of appellee himself," that the facts are: that appellee was to obtain the loan, take title in himself "so he could secure the loan by a mortgage on the property"; the loan to be repaid at the rate of $35.00 per month; that "appellant" *was* to make monthly payments; and that when "appellant" paid the note, appellee *intended* to convey the property to appellant.

The difficulty with appellant's reference to the evidence and his summation thereof is that consideration is lent only to the evidentiary phases favorable to appellant and little heed is given to the opposing testimony of appellee. The latter said that at the time he bought the property he had no agreement with appellant that he was to put up the money and take the title to the real estate for appellant's benefit; that appellant furnished none of the purchase money; that appellee furnished all of the money by obligating him-

self on the mortgage note to the bank; that it was his intention to convey the property to appellant if the latter made the payments due the bank on the note but his said intention was wholly voluntary on his part and he never told appellant about such intention; that it was his (appellee's) "idea" to buy the property to save his brother (appellant), let the latter live in the property, and if appellant paid him back, to deed the property over to appellant.

As far back as *Blair* v. *Bass* (1838), 4 Blackf. 539, 545, it was held that "a trust may be established by parol testimony against the answer of a defendant. In such case . . . *the testimony must be clear, and even then should be received with great caution.*" (Our emphasis.) That case has been consistently followed on the point referred to. See *Fausler and Others* v. *Jones and Others* (1855), 7 Ind. 277, 280; *Miller and Others* v. *Blackburn* (1859), 14 Ind. 62; *Parmelee et al.* v. *Sloan et al.* (1871), 37 Ind. 469, 482; *Rucker* v. *Steelman* (1881), 73 Ind. 396; *Hutton et al.* v. *Cunningham et al.* (1901), 28 Ind. App. 295, 297, 61 N. E. 1138; *Koehler et al.* v. *Koehler et al.* (1919), 75 Ind. App. 510, 529, 121 N. E. 450; *Philbin et al.* v. *Carr et al.* (1920), 75 Ind. App. 560, 582, 129 N. E. 19; *Bullerdick et al.* v. *Miller et al.* (1926), 85 Ind. App. 369, 376, 377, 152 N. E. 280. See, as declaring the rule more emphatically, *Vonville et ux.* v. *Dexter, Trustee* (1948), 118 Ind. App. 187, 208, 209, 76 N. E. 2d 856; *Costa et al.* v. *Costa et al.* (1953), 124 Ind. App. 128, 134, 115 N. E. 2d 516; *Bradley* v. *Talarico* (1958), 129 Ind. App. 544, 153 N. E. 2d 505, 506. In *Koehler et al.* v. *Koehler et al., supra,* it is said: "The proof must be *clear and unequivocal.*" (Emphasis supplied), and in *Bullerdick et al.* v. *Miller et al., supra,* and *Vonville et ux.* v. *Dexter, Trustee, supra,* it is declared that "It is

settled by a complete unanimity of decisions that *such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged beneficiary beyond a doubt."* In *Bradley* v. *Talarico, supra,* it is said that "the standard of evidence for such purpose is a superior measure of proof."

In order that a trust may arise within the provisions of §56-608, Burns' 1951 Replacement, our courts have laid down certain elements that are essential. They are: (1) The parties must have made an agreement of the kind indicated in the clause referred to, which agreement is absolutely required by the plain words of the statute; (2) The agreement must have been made before the title to the real estate was acquired; (3) There must have been a valuable consideration for the agreement, which consideration need not consist of actual money; (4) The transaction must be free from fraud; (5) The proof must be clear and unequivocal; (6) The agreement must be fair. *Koehler et al.* v. *Koehler et al., supra; Bullerdick et al.* v. *Miller et al., supra.*

The trust, if it arises at all, arises at the inception of the title and must depend upon the transaction as it occurred up to that time, and it cannot be changed by any subsequent transaction, except as such subsequent transaction may throw light upon the original. *Hughes et al.* v. *White et al.* (1888), 117 Ind. 470, 473, 20 N. E. 157; *Kemp* v. *Elder* (1930), 91 Ind. App. 65, 70, 170 N. E. 90; *People's Bank and Trust Company, Executor* v. *Mills* (1923), 193 Ind. 131, 137, 139 N. E. 145.

Measured by the aforementioned basic essentials, it is clear that the evidence, even if viewed in a light most favorable to appellant, falls far short of establishing a resulting trust favorable to appellant. The evidence on

the issue of an alleged trust agreement of the kind indicated in the referred to statute is not clear, it is not strong, it is not unequivocal, it is not unmistakable, and it does not establish payment by appellant. The evidence is uncontradicted that appellant furnished no part of the purchase money. There is no evidence of any consideration for the alleged trust agreement.

The testimony of Mr. Harlan, related above, does not establish any trust agreement between appellant and appellee. The best that could be said of it is that he was "told" that "these brothers had worked something out" and that he had no specific recollection of any definite conversation.

Although the evidence favorable to appellee is controlling in our consideration of the instant question, yet if the same weight is accorded the testimony of appellant, it defeats itself. Appellant had lost his title to the real estate by virtue of the sale in the foreclosure proceedings. Mr. Harlan, the purchaser at the sale, owned and held all the title to and interest in the land. There was no further right of redemption. Harlan could have sold the property as his own. He was under no obligation to recognize either the appellant or the appellee.

Appellant said he endeavored to buy from Harlan and paid the latter $50.00 for "holding off" until appellant could "talk it over" with his wife. He could not make arrangements for the sale. He then tried to borrow from the bank but was unable to do so because his wife wouldn't sign the papers. Then appellant said he discussed with appellee the "possibility" of "his buying this property"; that "him and I talked about the deal, if we would let it go into his name, *I would pay it off*"; that "I would pay the bank off. *I would make all the payments up there at the*

*bank."* Other evidence shows that appellant paid nothing toward the purchase price at or prior to the time property was purchased; the taxes on the real estate were delinquent and the property was about to be sold at tax sale; he did not become legally obligated for any part of the purchase price or to make any payments to the bank or elsewhere; and he did not "make all the payments up there at the bank." Without indulging in further detail and analyzation, it seems clear that appellant's own version of the transaction, even if it stood undenied, fails in many respects to conform to the essential elements pronounced by our courts as requisite to the establishment of a resulting trust. ". . . all presumptions are against him who seeks to establish a resulting trust, and the burden is upon him to prove all the elements essential under the statute to the existence of the trust." *Koehler et al.* v. *Koehler et al., supra,* on page 528.

Appellant proposes, in his reply brief, that "Under the law as set out in Appellant's Brief, the purchase money should be held to be the funds of Appellant." No authority is cited and no argument is made on the point. As appellant does not inform us of what "law" in his original brief he has reference to, we must remain without such information. We have been unable to detect any "law" cited in appellant's original brief which would warrant the holding proposed. And we find no evidence from which it could be so inferred, and appellant directs our attention to none such. Appellant simply says that appellee considered that appellant was the real owner and, therefore, we should consider the funds appellee obtained from the bank as a loan to appellant. There is no evidence of any such agreement between the parties and we are not authorized to create such an agreement for them. Nor do we find any evi-

dence that appellee considered appellant to be the real owner of the real estate.

Appellant says in his reply brief that he gave appellee the privilege to live in the property and that "the fact Appellee did live in the property *at different times*, there can be no question that Appellant paid valuable consideration for the agreement." This contention, of course, is wholly without merit. It is primarily based on the unfounded assumption that appellant owned the property and, as such owner, was in position to extend appellee the "privilege" of "living" in the property. Further, if it be conceded, for the purpose of discussion, that the extension of such privilege and the asserted fact that appellee did live there constituted a consideration, such consideration was furnished subsequent to the conveyance to appellee, not at or before. A resulting trust cannot be created by funds or after-advances furnished subsequent to the time of the purchase and conveyance. *Kemp* v. *Elder, supra,* on page 70; *Hughes* v. *White, supra,* on page 473; *Olcott* v. *Bynum* (1872), 84 U. S. 44, 21 L. Ed. 570.

Next the appellant urges that the "facts of the record" justify us in finding that a "constructive trust was established in this case." Appellee says that appellant's cross-complaint put in issue only whether there was a resulting trust; that there was no issue of a constructive trust; that the cause was tried on the theory of a resulting trust and not that of a constructive trust; and that such issue was never presented or discussed until appellant brought it forth in his original brief. We cannot concur in whole with appellee's assertion. The action begun by appellee is an action in ejectment. Appellant answered the complaint in denial and filed his counterclaim alleging a resulting trust in his favor.

Under the answer of denial, appellant was entitled

to give in evidence all his defenses, legal and equitable, to defeat appellee's claims. Sec. 3-1308, Burns' 1946 Replacement. Appellee's complaint alleged that he was "the owner" of the described real estate. Under the denial, appellant was authorized to contest that allegation by any competent evidence tending to establish that appellee was not the owner of the real estate and, therefore, not entitled to the possession thereof because he held the same in trust for appellant. Any evidence of appellee's trust relationship for appellant, whether a resulting trust or a constructive trust, was admissible under the answer of denial for the purpose of defeating appellee's claim to possession.

However, appellant would not be entitled to affirmative relief under said answer. *Emily* v. *Harding* (1876), 53 Ind. 102, 103. Any affirmative relief attainable by him was afforded only through the allegations of his counter-claim. *East* v. *Peden* (1886), 108 Ind. 92, 95, 8 N. E. 722; *Crecelius et al.* v. *Mann* (1882), 84 Ind. 147, 148; *Wieneke et al.* v. *Deputy* (1903), 31 Ind. App. 621, 623, 68 N. E. 921.

Appellant says we should declare a constructive trust to prevent unjust enrichment of appellee and that to permit the judgment to stand would deprive appellant of his "equity of redemption." He further says that if we should conclude that there was no intention by appellee to hold the property in trust for appellant, yet we should declare a trust contrary to the intention because to permit appellee to retain the property would be contrary to equity and good conscience. He cites, quotes from, and heavily relies upon *Markham et al.* v. *Katzenstein et al.* (1904), 209 Ill. 607, 70 N. E. 1071, which, he says, "is very applicable to the facts in this case."

We have found no case which on the facts and the law is less favorable to appellant's position than the cited Markham case. The evidence in that case showed that a mortgage was foreclosed on the real estate involved, and the real estate was sold at a master's sale, the mortgagee being the purchaser. The time for redemption, as in the present case, had expired and, as in the instant case, the purchaser at the sale had obtained the deed to the property. The defendant (appellee in the case) purchased the real estate from the holder of the deed and paid for it by borrowing some of the purchase price from his brother, and giving the seller his mortgage on the property for the balance. The plaintiffs (appellants in the case) introduced evidence that they interviewed defendant with reference to the transaction and that he agreed he would furnish the money and take the title, hold it in trust for the plaintiffs, and when they paid him the amount paid by him, with interest, the plaintiff should have a deed from him to them for the land. Their evidence showed that the conversations to the effect aforesaid took place both before and after the defendant obtained the deed. There was evidence, also, that the defendant told numerous persons that plaintiffs were to have the property whenever they paid for it. There was further evidence that the plaintiffs had paid the interest as agreed, paid taxes, and placed permanent and valuable improvements upon the land. The defendant denied said conversations and said he refused to go into such transaction and that he would buy the land for himself and plaintiffs could occupy the land as tenants, if they so wished. The plaintiffs did occupy the land under leases from the defendant. There was much other evidence but the foregoing are the important facts as to the asserted creation of the alleged trust. It is noted that in many respects the

aforesaid facts present a situation much in keeping with those made apparent in the present case.

The court in the case last referred to said, that the evidence showed that (as here) the plaintiffs had no equity in the property, as it had been "swept away" and the purchaser at the mortgage sale had a valid deed; that (as here) no part of the purchase money was paid by the plaintiffs, and that according to plaintiffs' own testimony the case was one in which the defendant had agreed to buy the land, giving his note and mortgage for the purchase of it, taking a deed to himself, and agreeing to hold it in trust until plaintiffs paid the purchase price with interest. That no time was fixed for the payment of the money, and no manner of payment agreed upon. Then the court inquired:

> "From such a transaction as this, can it be said that a trust arises in any form? We think not. . . . the party claiming the benefit of the trust must bear such a relation to the property out of which the trust is supposed to arise, that, taking into consideration the relations of the parties . . . to the property itself and the agreement of the party . . . , to permit the latter to deny the trust . . . would be more than a mere moral wrong, but would amount to a legal fraud."

The court, in said Markham case, proceeds to quote from Pomeroy, on Equity, a portion of which is:

> ". . . there must be something more than a mere verbal promise, however unequivocal; otherwise, the statute of frauds would be virtually abrogated. *There must be an element of positive fraud accompanying the promise, and by means of which the acquisition of the legal title is wrongfully consummated.*" (Our emphasis.)

As a climactic statement the court says:

> "The whole agreement relied upon here, and tending to support which there is any evidence, is a

parol agreement to convey land, in which, we think, *there is such absence of fraud as fails to create the relation of the parties that of a trust relation."* (Emphasis supplied.)

As indicated before, we fail to see where the aforesaid case lends solace to the appellant herein.

But appellant insists that the parties here are brothers; that appellant had a "prior interest" in the property; that appellant paid all the original loan, ▉ except $60.74; that he made lasting improvements on the property; and that "in equity and good conscience" we should declare a constructive trust. Of course, appellant overlooks the fact that the evidence on the suggested matters, except that the parties were brothers and that appellant formerly owned the property, was in conflict and that we must accept that favorable to the trial court's conclusion. Such evidence does not show that appellant had any interest in the real estate at the time appellee bought it, and it does not show that appellant paid all the loan except $60.74. And it certainly does not show any fraud, actual or constructive, on the part of the appellee; and no circumstances which show or indicate any deceit or wrongful conduct by appellee, by means of which he acquired the title to the real estate, are present. The evidence discloses that appellee bought the property to save appellant and permitted appellant to stay in the property, with the undisclosed intention of conveying the property to appellant if the latter paid him back. The evidence also reveals that appellant did not pay him back, he allowed the loan to become delinquent and appellee was required to bring it up to date, appellant did not pay back the delinquent taxes appellee was required to pay, there is no evidence that he paid any of the loan expense, and, in fact, the evidence does not show that he

paid anything except some payments on the loan totalling approximately $700.00. Such evidence surely shows no bad faith, deceit or fraud on the part of appellee and, on the contrary, it shows that appellant, even if his testimony be accepted as without conflict, did not perform his own admitted obligations.

In *Vance et al.* v. *Grow et al.* (1934), 206 Ind. 614, 190 N. E. 747, Judge Roll made some interesting declarations on the matter of constructive trusts which seem apropos at this point. He said:

> "Appellants contend that there was a confidential relation existing between Sarah Shultz and Helen Grow, and that Sarah Shultz relied upon the oral promise of Helen Grow to carry out her desires. The *Westphal* v. *Hickman* case, *supra,* says that the fact that the father reposed confidence in his son is not enough to show that fraud was practiced. The court further said that,
>
> " 'It must further appear that the grantee, *at* or *before* the time of such conveyance, abused the confidence reposed *in such a way* as to improperly influence the grantor, or to mislead or overreach him, and thus to obtain an unconscionable advantage for himself; or the relationship shown between the grantor and the grantee must be of such character that the exercise of such improper influence can be presumed as a matter of law.' "

Later, in the said *Vance* case, the court said:

> ". . . There must be conduct influential in producing the result, and but for which such result would not have occurred, amounting in a court of equity to fraud, to save it from the operation of the statute of fraud."

The court, in the Vance case, also made reference to the case of *Moore* v. *McClain* (1918), 68 Ind. App. 102, 119 N. E. 258. On page 107 of the latter case, the court said:

". . . but appellant insists that the trial court should have taken the contrary view, because the presumption must obtain that an unfair and █ unjust advantage was taken of appellant because of the peculiar confidential relations which existed between the parties, and relies on the principle of law which has been announced by the courts in the following or similar language: If one obtains the legal title to property by virtue of confidential relations and influence under such circumstances that he ought not according to the rules of equity and good conscience retain the benefits thus acquired, a court of equity in order to administer complete justice between the parties, will raise a trust by construction out of such circumstances and relations, the execution of which will be enforced. (Citing cases.)
". . .

"While the doctrine announced in the cases is well grounded and should always be applied in proper cases, *it cannot be applied unless the evi-* ██ *dence is sufficient to show actual or constructive fraud.* In other words, *the fraud out of which the court can construct a trust must be at the inception of the transaction.* The court cannot construct a trust where the misconduct amounts simply to a breach of the contract to convey where there was no fraud or undue influence connected with the transaction in its inception." (Our italics.) Sec. 54 Am. Jur., *Trusts,* §236, p. 180; 89 C. J. S., *Trusts,* §139c, p. 1023.

Under the rules laid down in the aforesaid authorities, we are unable to find that the evidence herein was such as to require the trial court to find the existence of a constructive trust as appellant urges.

In his reply brief, appellant asserts that the appellee has not "proven" that he is "entitled to possession of the real estate in question." Such contention was █ not urged or argued in appellant's original brief and comes too late in the reply brief for consideration. *Marion Trust Company, Receiver* v. *Blish*

(1908), 170 Ind. 686, 699, 700, 84 N. E. 814; *Rust* v. *Schwiening* (1919), 72 Ind. App. 497, 501, 124 N. E. 878; *American Coal Mining Company* v. *Knight* (1923), 80 Ind. App. 30, 33, 139 N. E. 463; I. L. E., *Appeals*, Vol. 2, §395, note 19, page 279.

Appellant has demonstrated no reversible error.

Judgment affirmed. Bierly, J., Gonas, C. J., and Smith, J., concur.

NOTE.—Reported in 162 N. E. 2d 329.